73 F.3d 374
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Carlos ROMERO, Defendant-Appellant.
 No. 94-6416.
(D.C.No. CR-94-88-C)
 United States Court of Appeals, Tenth Circuit.
 Dec. 28, 1995.
 
 Before TACHA, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and HENRY, Circuit Judge.
 ORDER AND JUDGMENT[1]
 ROBERT H. McWILLIAMS, Senior Circuit Judge.
 
 
 1
 In a 60-count superseding indictment, Carlos Romero, the appellant, his father, Jesus Romero, and eight others were charged with various drug and drug related offenses. Pursuant to a plea agreement, Carlos Romero, hereinafter referred to as simply Romero, pled guilty to count one of the superseding indictment which charged him with conspiring with others to possess with an intent to distribute and to distribute cocaine powder, a Schedule II controlled substance, in violation of 21 U.S.C. 846. Part of the plea agreement was that the remaining charges against Romero would be dismissed, which they were.
 
 
 2
 The case was set for sentencing purposes on October 31, 1994. However, because of certain amendments to the Sentencing Guidelines to be effective on November 1, 1994, which amendments were to Romero's benefit, the court, apparently without objection, continued sentencing to November 3, 1994. In the meantime, the Probation Department prepared a presentence investigation report, to which Romero filed certain objections. Objections were made, inter alia, to paragraphs 34 and 35 of the report, which paragraphs stated that Romero over a period of time had sold and delivered to one Lawrence Tingle 450 ounces of cocaine (powder) which Romero knew would be "cooked" by Tingle into cocaine base before being sold by Tingle to the ultimate user, all of which, for guideline calculations, meant that the "total marijuana kilogram equivalent ... is 263,223.17."
 
 
 3
 In a hearing held on Romero's objections to paragraphs 34 and 35, the district court overruled the objections. The district court then accepted the recommendation contained in the presentence report that Romero's adjusted base offense level be 42, and that his criminal history category was II, which set Romero's guideline range at 360 months to life. The district court, after hearing counsel, sentenced Romero to imprisonment for 360 months.
 
 
 4
 On appeal, counsel asserts two grounds for reversal: (1) the district court erred in computing the quantity of drugs attributable to Romero; and (2) the government violated the plea agreement. Neither of these grounds persuades us and we therefore affirm. Only brief reference to the facts is necessary to put these matters in focus.
 
 
 5
 Romero was the leader of a drug ring that operated in Oklahoma City, Oklahoma, from about 1992 to 1994. The Federal Bureau of Investigation and the Oklahoma City Police Department began their investigation in 1992. Confidential informants identified Lawrence Tingle as one who was trafficking in cocaine and marijuana in numerous Oklahoma City bars.
 
 
 6
 On December 9, 1993, a search warrant was executed at the residence of Lawrence Tingle, and 40 grams of cocaine base, 10 pounds of marijuana and 11 firearms were seized in the search. Tingle identified his source for the drugs as an individual named "Carlos." Surveillance had already placed Romero at Tingle's residence, and had also placed Tingle at Romero's residence on several occasions. A second search warrant was executed at Tingle's residence in which small quantities of cocaine base and marijuana were seized, along with approximately $2,713 in U.S. currency.
 
 
 7
 Search warrants were subsequently executed on Romero's residence and on a house owned by Romero, but lived in by his parents, Jesus and Petra Romero. Some of the items seized from Romero's residence included 112 pounds of marijuana, over 900 grams of cocaine, 7 firearms and approximately $16,400 in U.S. currency. In the search of the residence owned by Romero, but lived in by his parents, a kilogram of cocaine powder, an Uzi semi-automatic weapon, and approximately $310,042.56 in U.S. currency, inter alia, were seized.
 
 
 8
 As stated, Romero was the head of this drug operation in Oklahoma City. Couriers transported the cocaine to Oklahoma City from the Houston, Texas area. The cocaine was kept either in Romero's residence or his parents' residence. The cocaine was then sold and delivered to various "customers" of Romero, including Lawrence Tingle, who, in turn, sold the cocaine "on the street." So much for the background facts.
 
 
 9
 As indicated, counsel objected to paragraphs 34 and 35 of the presentence report, which, inter alia, recommended that Romero be held accountable for Tingle's conversion of cocaine powder to cocaine base. A hearing was held on this objection, at which time, Lawrence Tingle, Tina Ramos and Martin Winn testified for the government. On direct examination, Tingle testified that much of the cocaine powder which he received from Romero was "cooked" into cocaine base, sometimes referred to as crack cocaine, before resale. He stated also that he wanted the cocaine which he got from Romero to be "without any cut," adding that "anything that's cut doesn't rock up."
 
 
 10
 Tina Ramos testified that she lived at Romero's residence for several years and that Romero told her that if she put "B-12 into the cocaine for Lawrence Tingle, he couldn't make rock cocaine out of it." Accordingly, she testified, "B-12" was not put in the cocaine delivered to Tingle.
 
 
 11
 Martin Winn testified that he, at one time, lived with Romero and during that time he made numerous deliveries to Tingle and that he was under instructions from Romero "not to add the Vitablend to cut any cocaine that was going to Lawrence Tingle."
 
 
 12
 Based on the testimony of Tingle, Ramos and Winn, the district court found as follows:
 
 
 13
 THE COURT: Well, clearly Mr. Romero must receive credit for the activities of co-conspirators made during the course of the conspiracy which were reasonably foreseeable and within the scope of the conspiracy, and clearly Mr. Tingle's rocking up the powder cocaine was all of those things and certainly the evidence is substantial and meets the preponderance of the evidence standard that Mr. Romero knew what Tingle was doing with the powder cocaine and assisted him in doing that by not cutting it with any cutting agent and instructing others who worked for him not to cut Tingle's cocaine so that it could be cooked up.
 
 
 14
 As to the amounts, either which Tingle cooked or were obtained by him during this time period, the amounts reflected in the presentence report are conservative estimates. They are supported by the evidence that I've heard here. There is no way to get a final and completely accurate picture of how much is distributed once it's gone but I am bound only by a preponderance of the evidence and the credible evidence and a preponderance of the credible evidence indicates that the amounts listed in the presentence report are accurate.
 
 
 15
 We agree with the holding of the district court that the evidence showed that Romero not only knew that Tingle was "rocking up" the cocaine powder which he got from Romero, but that he assisted Tingle by not "cutting" the cocaine powder sold Tingle which helped Tingle when he "rocked up" the uncut cocaine powder.
 
 
 16
 The present case is similar to United States v. Angulo-Lopez, 7 F.3d 1506 (10th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1563 (1994). On appeal, in that case, the defendant contested the conversion of cocaine powder to cocaine base for sentencing purposes and also argued that he was improperly assigned an amount of cocaine base which was "cooked" and distributed solely by co-conspirators. In rejecting these arguments, we spoke at pages 1511 and 1512 as follows:
 
 
 17
 According to U.S.S.G. 2D1.4 (1991), "[i]f a defendant is convicted of a conspiracy or an attempt to commit an offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt had been completed." The district court made the factual determination that the cocaine powder involved in the conspiracy was routinely converted to crack. The eventual conversion was foreseeable to, if not directed by, Mr. Angulo-Lopez. Under the guidelines, it is proper to sentence a defendant under the drug quantity table for cocaine base if the record indicates that the defendant intended to transform powdered cocaine into cocaine base. The record supports the district court's findings that Mr. Angulo-Lopez intended the powdered cocaine to be converted into crack.
 
 
 18
 Turning to Mr. Angulo-Lopez' contention that he was sentenced for drugs distributed independently by other members of the conspiracy, we repeat one of the fundamental principles of conspiracy law. "One of the measures employed in determining the severity of a drug conspiracy offense is the amount of narcotics involved in the entire conspiracy, not just the amount with which the defendant dealt personally." The defendant is held responsible for all reasonably foreseeable transactions. Our review of the record reveals that the district court correctly determined that the cocaine distributed and crack manufactured by the conspiracy was foreseeable to Mr. Angulo-Lopez as the leader of the conspiracy, and thus we find no sentencing computation error. (citations omitted).
 
 
 19
 Romero's second ground for reversal is that the government violated the terms of the plea agreement. The plea agreement contained, inter alia, the following:
 
 
 20
 At the time of sentencing, the Government will make no recommendation as to the actual sentence to be imposed, but may provide pertinent facts and other information to the Court concerning the offense and the defendant's involvement in it.
 
 
 21
 The government agrees to advise the sentencing court, prior to sentencing, of the nature and extent of the cooperation provided by this defendant, by means of a confidential memorandum.
 
 
 22
 At sentencing, defense counsel advised the court that the government had not filed a "confidential memorandum" setting forth the "nature and extent of cooperation provided" by Romero. In this regard, the prosecuting attorney advised the district court that she had not filed such memorandum because she was unaware that Romero was willing to assist or cooperate "in any way, shape or form."
 
 
 23
 Under these circumstances, Romero did not come within the purview of U.S.S.G. 5K1.1 (1994), which permits a district court to depart from the guidelines on motion of the government stating that a defendant has "provided substantial assistance in the investigation or prosecution of another person who has committed an offense." We do not regard this as a material breach of the plea agreement. See United States v. Easterling, 921 F.2d 1073 (10th Cir.1990), cert. denied, 500 U.S. 937 (1991). In this general connection, we do note that counsel at no time asked the district court to permit Romero to withdraw his plea of guilty because of the government's breach of the plea agreement.
 
 
 24
 Counsel also asserts that the government breached the plea agreement which provided, inter alia, that the government "would make no recommendation as to the actual sentence," but could "provide pertinent facts and other information to the Court concerning the offense and the defendant's involvement in it." At sentencing, defense counsel argued that Romero should be sentenced "at the bottom of the guideline range," which as indicated was 360 months, because Romero was the son of migrant farm workers, had little education, and the like. In response, the prosecuting attorney detailed some "additional information about Mr. Romero," pointing out, inter alia, that if Romero had been sentenced on October 31, 1994, the original date for sentencing, he would be faced with a mandatory life sentence and concluded by asking the court "to consider the upper range in this particular case."
 
 
 25
 We need not here decide whether the government violated its agreement with these statements. For, in any event, the district court was not persuaded by the government's argument and sentenced Romero to 360 months imprisonment, the "bottom" of the guideline range. See United States v. Easterling, supra.
 
 
 26
 Judgment affirmed.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470